UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:09-CV-01809 |
| GEORGE WESLEY HARRIS, *et al.*, | § § | |
| Defendants, and | § § | |
| GIANT PETROLEUM, INC., and DSSC OPERATING, LLC, | § § § | |
| Relief Defendants, Solely for the Purposes of Equitable Relief | § § | |

## MEMORANDUM OPINION AND ORDER

Having reviewed the Receiver's Motion for Approval of Distribution Plan (doc. 298), and Supplemental Motion for Approval of Distribution Plan (doc. 304) (together, the "Motions"), the Court concludes that the Receiver has not yet put forth sufficient information or a suitable plan for distribution. Thus, as follows, the Court **DENIES** Receiver's Motions, and **ORDERS** the Receiver to provide the Court with detailed information with respect to the Receivership's finances in accordance with the Court's below instructions.

## I.

## ANALYSIS

On September 29, 2009, the Court, "[i]n contemplation of the eventual return of assets to investors harmed by the misconduct alleged in the Complaint," appointed the Receiver in this case

"to marshal, conserve, hold and, where necessary, operate [the harmed investors'] assets pending further order of the Court." Doc. 8, Or. 1. By July 2011, the Court began to express concerns that certain actions and proposals of the Receiver were not "in keeping with the Court's goal to preserve assets and reimburse the defrauded investors to the maximum extent possible." Doc. 213, Or. Appointing Examiner 2. After considering the opinion of a court-appointed examiner and the Receiver's assurances, the Court allowed the Receivership to move forward. Then, in the spring of 2013, the Court again expressed concerns that Receivership's goals "ha[d] not been realized." Doc. 264, Or. 1. The Court noted that "the Receiver has yet to provide the Court with evidence that her efforts have been or will be fruitful or instead are unnecessarily depleting the remaining Receivership assets." Doc. 267, Or. 1. While the Court believed there to be "insufficient justification for further continuation of the Receivership," *id.* at 2, it ultimately allowed the Receivership to continue based on renewed assurances from the Receiver and the recommendations of other interested parties. *See, e.g.*, Doc. 269, Receiver's Status Report; Doc. 274, Pl.'s Notice; Doc. 276, Status Report Or.

Now before the Court is the Receiver's Motion for Approval of Distribution Plan (doc. 298) and Supplemental Motion (doc. 304) filed October 29, 2014 and January 27, 2015, respectively. In her Motions, the Receiver informs the Court that "the Receivership Estate has total assets of $681,065.35." Doc. 298, Mot. 12. She proposes a plan that divides these "total assets" as follows. Initially, the Receiver asks the Court to set aside $91,065.35—$64,487.18 "to secure liability for wells" and "$26,578.17 to wrap up the Receivership"—leaving a pool of $590,000 (the "Claimant Pool") for distribution among the Estate's claimants. *Id.* at 18 n.9. Then, the Receiver asks the Court to divvy up this Claimant Pool among two claimant groups: "Qualified Professional Claims and Administrative Expenses" and "Defrauded Investors." Relying on "traditional judicially-sanctioned

priority" standards, the Receiver proposes that the Court distribute the Claimant Pool such that the first group receives either 90%, 70%, or 50% of their outstanding claims, with the Investors receiving whatever remains. *Id.* at 17-18. The Receiver argues that the Court should approve her proposal, because it is fair and reasonable to all claimants. *Id.* at 20. The Court disagrees.

The Receiver's proposal is deficient in two respects. First is that the Receiver fails to adequately account for the Receivership's assets and liabilities. The Court stated in its initial Order appointing the Receiver that one of the Receiver's fundamental duties is "to timely account for all monies, securities, and other properties which may come into her hands." Doc. 8, Or. 2; *see also In re Sundance Corp., Inc.*, 149 B.R. 641, 653 (Bankr. E.D. Wash. 1993) ("A receiver must account for its stewardship of the receivership assets."). Before the Court can approve the Receiver's proposed plan of distribution, it must satisfactorily determine that the Receiver has adequately fulfilled this fundamental duty that the Court imposed at the outset. At present, however, the Receiver has only provided a vague—and, at times, inconsistent—account of the Receivership's finances.

To illustrate, the Receiver's Motions include no itemized list of Receivership assets and liabilities, or any other "account [of] all monies, securities, and other properties which [have] come into her hands" during the course of her receivership.  Doc. 8, Or. 2. Instead, her Motions vaguely identify the total assets that remain—$616,578.17 in cash, with a $64,487.18 cash bond posted in New Mexico—without clarifying the source of any of this cash. Doc. 298, Mot. 12; Doc. 304, Supp. Mot. 4. This lack of precision is especially troubling, given the unexplained inconsistencies with the Receiver's previous representations to the Court. For example, after the Court expressed concern in May of 2013 over the Receivership's continued existence, the Receiver assured the Court that, even "conservatively estimated," the Receivership's continued existence should produce $1,251,712.19

in assets. Doc. 269, Report of Receiver 2, 3. Then, nearly a year later, and without any explanation, the Receiver represented to the Court that the total assets collected as of April 2014 totaled $738,277.98. Doc. 287, Status Report of Receiver & Recommendation. Now, the Receiver, again without explanation, informs the Court that only $681,065.35 in assets remain. Doc. 298, Mot. 12; Doc. 304, Supp. Mot. 4. Still more puzzling, the Receiver asks the Court to set aside $26,578.17 of these minmal assets to "wrap up the Receivership" in unspecified ways, $64,487.18 currently held in "bonds" without any identified beneficiary once returned, and 50-90% of what remains for the "Qualified Professionals"—i.e., the three law firms the Receiver employed during this case—without any evidence of the underlying work this group allegedly performed.[1] Doc. 298, Mot. 17, 18 & n.9. The Court cannot even begin to review the reasonableness of the Receiver's plan until these inconsistencies are explained with concrete details as to the Receivership's finances.

The second reason for denying the Receiver's Motions is that her distribution plan, as it stands, is neither fair nor reasonable. The Court's "primary job" in reviewing a receiver's distribution plan "is to ensure that the proposed plan of distribution is fair and reasonable." *S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 332 (7th Cir. 2010) (citing *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C.*, 467 F.3d 73, 84 (2d Cir. 2006)). In making such a determination, the Court "is vested with broad discretionary power." *S.E.C. v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (citing *Quenzer v. United States*, 19 F.3d 163, 165 (5th Cir. 1993)). Pursuant to this broad authority, the Court is not bound to follow any particular plan or method of distribution

---

[1] The Receiver does not actually ask that the Court distribute this set-aside directly to the "Qualified Professionals," but requests that the Court set a specific sum of money aside that may later be divvied up among this group. Thus, the Receiver is effectively asking that the Court, without first looking at any of their fee applications, determine that the claims of this group as a whole are fair, reasonable, and justified.

simply because it is "permissible under the circumstances." *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996). Rather, the Court is afforded broad discretion to determine "a logical way to divide the money," and tailor a distribution plan accordingly. *Forex*, 242 F.3d at 331 (citing *Durham*, 86 F.3d at 73); *see also Wealth Mgmt. LLC*, 628 F.3d at 333 (quoting *SEC v. Enter. Trust Co.*, 559 F.3d 649, 652 (7th Cir. 2009)) ("[D]istrict courts supervising receiverships have the power to 'classify claims sensibly.'").

Here, the Receiver's distribution plan does not appear to be unreasonable at first glance: pay a priority claimant group, "Qualified Professional Claims and Administrative Expenses," at a reduced rate of 50-90%, with the remainder of the Claimant Pool going to Defrauded Investors on a pro rata basis. But while this proposal may appear justifiable on its face, a closer looks reveals that the plan is completely unreasonable and unfair in a number of respects.

First, the Receiver's entire proposal is founded on a misapprehension of the law. The Receiver suggests throughout her Motions that courts follow some rigid hierarchy for determining the priority of claims, but none of the lower court decisions cited in her Motions actually support such a proposition. *See, e.g.*, *S.E.C. v. HKW Trading LLC*, No. 8:05-CV-1076-T-24-TB, 2009 WL 2499146, at *5 (M.D. Fla. Aug. 14, 2009) (judging priority according to what is "fair, just, and reasonable," and ultimately concluding that "while subordination of [the attorney's] claim would eliminate the unfairness to the defrauded investors caused by the priority status of [the attorney's] claim, such subordination would unfairly deny [the attorney] fees that she is entitled to under Florida's offer of judgment statute"); *In re Indian Motorcycle Litig.*, 307 B.R. 7, 16 (D. Mass. 2004) ("[I]n a receivership proceeding of this nature, this court sits in equity, and the allocation of priority lies within the trial court's sound discretion."). As detailed above, the Court's equitable authority in reviewing a

distribution plan is broad; it need not follow a particular plan simply because prior courts sitting in equity found such plans "fair and reasonable" under completely different circumstances.[2]

Next, even if equity favors giving some priority to "Qualified Professional Claims and Administrative Expenses," that would not justify the Receiver's plan, which asks for much more than a mere degree of priority for reasonable expenses. As an initial matter, the label "Qualified Professional Claims and Administrative Expenses" is a misleading way to characterize this group of claimants that the Receiver is seeking to give priority to. Despite its name, this group is made up entirely of three law firms that the Receiver worked for and/or hired during the course of these proceedings, who claim fees for services that are only vaguely discussed in the Receiver's Motions. *See* Doc. 304, Supp. Mot. 4-5. In fact, not only does the Receiver fail to identify any "Administrative Expenses" associated with this group of claims, she inexplicably asks the Court to set aside $26,578.18 from the Claimant Pool to "wrap up the Receivership," even though such costs are ostensibly administrative. Doc. 298, Mot. 18 n.9. In other words, though not framed this way, the Receiver is effectively asking for 100% payment of administrative expenses, and anywhere from 50-90% satisfaction of her outstanding attorneys' fees, before even considering the Defrauded Investors.

Even worse, the Receiver creates the false impression that her proposal merely divvies up "the *total assets*" that the Receiver collected during her Receivership. *Id.* at 17 (emphasis added). What the Receiver really means when she refers to "total assets" is total assets collected during the Receivership minus (1) $91,065.35 in wind-up costs to be set aside, and (2) $333,057.70 in

---

[2] *See* Marcus F. Salitore, *SEC Receivers vs. Bankruptcy Trustees: Liquidation by Instinct or Rule*, Am. Bankr. Inst. J., October 2003, at 8, 46 ("The federal receiver, therefore, becomes a liquidator without the supporting structure of the Bankruptcy Code, Rules and precedent. The procedure for liquidation becomes ad hoc, employing "equity" as the only guideline.").

previously-approved payments to select claimants. *See id.* at 10, 18 n.9. Among those select claimants are Wick Phillips Gould & Martin, LLP ("Wick Phillips") and Little Pederson Fankhauser, LLP ("LPF"), who the Receiver previously paid $201,081.18 and $5,496.28, respectively. *See id.* at 10 n.4. And yet, the Receiver now lumps the existing claims of these two law firms in her so-called "Qualified Professional Claims and Administrative Expenses" group, for priority payment of their existing legal bills, without any reduction to account for the significant sums they have already drawn from the Receivership's limited assets. To put this in perspective, the amount of Receivership assets that Wick Phillips has *already received* ($201,081.18) is nearly as much as the *maximum distribution* the Defrauded Investors would receive ($291,146.88) under the Receiver's plan. And consider this: if the Court were to approve the Receiver's first-choice plan to pay 90% of her "Qualified Professional Claims," Wick Phillips would rake in up to *ten times* as much in Receivership funds as the entire group of Defrauded Investors. The fact that the Receiver obscures these realities in her Motions is disconcerting, and another reason why her plan falls well short of "fair and reasonable."

Finally, perhaps the most troubling part of the Receiver's proposal is that it seeks to place all of the Receivership's failures, not on the people at the helm of the Receivership, but on a group of passive observers who have already had their investments squandered. As the Receiver admits, from the very "outset of the Receivership," she was able to "seiz[e] $359,904.17 from [Defendants'] bank accounts." Doc. 298, Mot. 9. Thus, if nothing else had been done beyond that point, investors, presumably, would have received more than the maximum distribution ($291,146.88) the Receiver currently proposes. Doc. 304, Supp. Mot. 9. Understandably, unforeseen difficulties and challenges arose during the Receivership that resulted in a lesser recovery than expected. But that does not justify a plan in which the victims in this case—who lost over $11 million—receive as little as

$52,064.39, while the Receiver, her attorneys, and other professionals—who at least had some control over the Receivership's performance—collect $870,993.31.[3] The Court cannot reasonably find such an arrangement to be "fair and equitable" under these circumstances.

## II.

## CONCLUSION

In light of the foregoing, the Court **DENIES** the Receiver's Motions (docs. 298, 304). Rather than have the Receiver resubmit a proposed plan of distribution at this time, the Court **ORDERS** the Receiver to <u>provide a full accounting of her Receivership within 21 days from the date of this Order</u>. This accounting shall include (1) all assets that the Receiver took possession, custody, or control of during the course of her Receivership, and the liquidation value of each asset;[4] (2) all Receivership liabilities the Receiver has paid or otherwise satisfied using Receivership funds or property; and (3) all remaining liabilities of the Receivership estate. In addition, the Receiver shall specifically indicate what she intends to do with the additional $91,065.35 she asked the Court to set-aside; merely stating that such funds will be used to "wind up" the Receivership will not suffice. Once the Receiver complies with this Order to the Court's satisfaction, the Court will invite the Receiver to resubmit proposed plan(s) of distribution.

Finally, the Court notes that it will not approve any plan of distribution that assigns priority to "Qualified Professional Claims," until, if at all, the Court receives evidence demonstrating the

---

[3] This number represents the $537,935.61 that would go to "Qualified Professionals" under the Receiver's 90% payment plan, and the $333,057.70 in payments the Court previously approved.

[4] For any asset the Receiver has not liquidated, the Receiver shall indicate the status of that asset and the anticipated return.

reasonableness of such claims. As such, either the Receiver herself or the Qualified Professionals are invited to submit fee applications in support of their claims following this Order. The Court will set a specific deadline for such fee applications in a later order.

SO ORDERED.

SIGNED: February 2, 2015.


_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE