UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:09-CV-1809-B |
| GEORGE WESLEY HARRIS, *et al.*, | § § § | |
| Defendants, and | § § | |
| GIANT PETROLEUM, INC., and DSSC OPERATING, LLC, | § § § | |
| Relief Defendants, Solely for the Purposes of Equitable Relief | § § | |

MEMORANDUM OPINION AND ORDER

Having reviewed the Receiver's Supplemental Response to Court's Order for Accounting and More Detailed Information in Support of Plan of Distribution (Doc. 314), the Court concludes that Receiver Karen Cook (the Receiver) has not put forth an equitable distribution plan, but has provided sufficient information for the Court to modify the Receiver's proposed plan to reach the most equitable result. The Court explains this modified plan below.

I.

BACKGROUND

On September 29, 2009, the Court, "[i]n contemplation of the eventual return of assets to investors harmed by the misconduct alleged in the Complaint," appointed the Receiver over Giant Petroleum, Inc. (Giant Petroleum), "to marshal, conserve, hold and, where necessary, operate [the

defrauded investors'] assets pending further order of the Court." Doc. 8, Order Appointing Receiver 1. Pursuant to this appointment, the Receiver took control of certain Giant Petroleum assets, including certain oil well properties in New Mexico. Doc. 213, Order Appointing Examiner 1. Over the next two years, the Receiver's management of these properties came into question. In July 2011, the Court expressed concerns that certain actions and proposals of the Receiver were not "in keeping with the Court's goal to preserve assets and reimburse the defrauded investors to the maximum extent possible," and even considered closing the Receivership. Doc. 213, Order Appointing Examiner 2. Eventually, the Court allowed the Receivership to move forward, but only after receiving assurances from the Receiver and a court-appointed examiner.

Then, in April 2013, the Court again expressed concerns that the Receivership's goals "ha[d] not been realized." Doc. 264, Order 1. The Court noted that "the Receiver has yet to provide the Court with evidence that her efforts have been or will be fruitful or instead are unnecessarily depleting the remaining Receivership assets." Doc. 267, Order 1. While the Court believed there to be "insufficient justification for further continuation of the Receivership," *id.* at 2, it ultimately allowed the Receivership to continue based on renewed assurances from the Receiver and the recommendation of the United States Securities and Exchange Commission (SEC). *See* Doc. 269, Receiver's Status Report; Doc. 274, Pl.'s Notice.

On October 29, 2014, the Receiver filed a proposed distribution plan. Doc. 298, Motion for Approval of Distribution Plan [hereinafter Receiver's Original Motion].[1] In her Motion, the Receiver

---

[1] The Receiver also filed a Supplemental Motion (Doc. 304). This Supplemental Motion updated the claim totals from the Original Motion. These updated totals, however, do not match her later filings; whereas, the totals from the Original Motion do match. For this reason, the Court will not consider the Supplemental Motion in its analysis.

informed the Court that "the Receivership Estate ha[d] total assets of $681,065.35." Doc. 298, Receiver's Orig. Mot. 12. She proposed a plan divvying these "total assets" as follows: she asked the Court to set aside $91,065.35—$64,487.18 "to secure liability for wells" and "$26,578.17 to wrap up the Receivership"—and to distribute the remaining $590,000 among the Receivership Estate's claimants. *Id.* at 18 n.9. The Receiver divided these claimants into three groups, which she denoted as Payee Groups: (1) "Qualified Professional Claims and Administrative Expenses"; (2) "Defrauded Investors"; and (3) "General Creditors Prior to Inception of the Receivership." *Id.* at 3–4. Relying on "traditional judicially-sanctioned priority" standards, the Receiver proposed a distribution framework that would pay out 90%, 70%, or 50% of the first Payee Group's outstanding claims, and pay whatever remained to the Defrauded Investors. *Id.* at 17–18. The Receiver argued this was fair and reasonable to all claimants. *Id.* at 20.

The Court disagreed, and on February 2, 2015, issued an order denying the Receiver's motions for two reasons: first, because the Receiver failed to "adequately account for the Receivership's assets and liabilities," and second, because her proposed distribution plan was "neither fair nor reasonable." Doc. 305, Mem. Op. & Order 3–4. The Court requested an "itemized list of Receivership assets and liabilities," *id.* at 3, and specifically denounced the Receiver's proposed distribution plan for prioritizing Qualified Professional Claims and Administrative Expenses over Defrauded Investors. *Id.* at 7. It viewed this prioritization as a shifting of the burden of Receivership losses from "the people at the helm of the Receivership . . . [to] a group of passive observers who ha[d] already had their investments squandered [i.e., the Defrauded Investors]." *Id.*

In response, the Receiver filed a supplemental accounting. Doc. 314, Receiver's Suppl. Resp. to Court's Order for Accounting [hereinafter Receiver's Supplemental Accounting]; *see also*

28 U.S.C. § 3103(g)(3) ("At the termination of a receivership, the receiver shall file a final accounting of the receipts and disbursements and apply for compensation setting forth the amount sought and the services rendered by the receiver."). The Receiver's Supplemental Accounting includes an analysis by forensic accountant Frederick M. Bennett, who prepared "annotated spreadsheets of the financial transactions [of the Receivership], categorized the expenditures and deposits, and determined the viability and efficacy of financial reporting that was permissible under GAAP." Doc. 314-1, Ex. A, Giant Receivership Accounting 2. This analysis provides sufficiently granular detail for the Court to understand the Receivership's assets and liabilities as well as its total assets available for distribution as of December 3, 2015—$680,878.64. *Id.* at 2, 4.[2]

The Receiver's Supplemental Accounting does not include a modified equitable distribution plan. Instead, it provides justifications for the Receiver's originally proposed distribution plan. From the Receiver's perspective, this "was not a typical 'liquidation receivership' where assets are identified and sold off to fund a distribution to victims and creditors"; rather, "the Receivership team [had] to reconstitute and run an unprofitable business for several years" before it could fully liquidate the Receivership's assets. Doc. 314, Receiver's Suppl. Accounting 2. She explains this led to the Receivership's extended duration and unexpectedly low total recovery.

These poor results stemmed in great part from the prolonged and fairly unsuccessful liquidation of several producing oil wells: the Matagorda 3 Joint Venture Wells (Matagorda 3), the

---

[2] Mr. Bennett, in his opinion letter to the Receiver's counsel, states that total net cash available is $608,878.64, but his supporting spreadsheets indicate that this amount actually is $680,878.64. *Compare* Doc. 314-1, Ex. A, Giant Receivership Accounting 2, *with id.* at 4. Accordingly, the Court will treat the first figure as a scrivener's error.

Receivership's largest liquidated assets.[3] The Receiver and her Team (the Receivership Team)[4] took over four years to sell these wells for approximately $500,000.00 less than originally predicted.[5] The Receiver maintains that they could not have recovered more, and that they could not have anticipated such a low recovery at the outset of the Receivership. *See generally id.* at 2, 5–7, 21. Even so, the original proposed distribution plan that the Court rejected as "neither fair nor reasonable," Doc. 305, Mem. Op. & Order 4, remains unchanged. Thus the Court again rejects it as neither fair nor reasonable. Therefore, the Court cannot approve it without modification.

     Fortunately, although the Receiver's Supplemental Accounting did not propose an equitable distribution plan, it did provide sufficient information for the Court to modify the Receiver's proposed plan to reach the most equitable result. Thus, the Court will craft its own proposed distribution plan modeled from the Receiver's. To do this, it will first determine the prioritization of claims against the Receivership Estate. Second, it will determine the total value of assets available for distribution by the Receivership Estate. Third, it will determine the total value of claims against the Receivership Estate. Fourth, it must consider whether the Receiver has acted reasonably and

---

[3] The Receiver's First Status Report described the Matagorda 3 Joint Venture Wells. Doc. 72, Receiver's First Status Report 6. Based on this description, the Court believes that these wells are the producing oil wells that later status reports described as the Receivership's largest liquidated assets. Consistent with this belief, the Court will refer to the producing oil wells as the Matagorda 3. Whether the producing oil wells and the Matagorda 3 are actually the same oil wells does not change the Court's analysis; it uses this name solely for clarity purposes.

[4] The Court uses the term Receivership Team to denote the Receiver and any qualified professionals employed to assist her, including attorneys, accountants, and consultants.

[5] Over the course of the Receivership, the Receivership Team marshaled $2,290,165.04 in revenue by seizing cash, liquidating assets, and operating oil wells. Doc. 314, Receiver's Suppl. Accounting 4–5. The largest liquidated assets were several producing oil wells (the Matagorda 3). *Id.* at 5–7. Originally, the Receiver anticipated selling these oil wells for more than $1,000,000.00, but in the end, sold them for only $470,000.00. *Id.* For more detail on the sale of these oil wells, *see infra* Part III.D.2.iii.b.

diligently, and whether existing claims for fees and expenses are reasonable. Fifth, it must propose a distribution framework. Finally, it must provide notice of the proposal to all interested parties, and then allow for objections, responses, and a hearing. The Court now considers the Receiver's Supplemental Accounting.

## II.

## LEGAL STANDARD

The Court's "primary job" in reviewing a receiver's distribution plan "is to ensure that the proposed plan of distribution is fair and reasonable." *SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 332 (7th Cir. 2010) (citing *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 84 (2d Cir. 2006)). In making such a determination, the Court "is vested with broad discretionary power." *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (quoting *Quenzer v. United States*, 19 F.3d 163, 165 (5th Cir. 1993)). Pursuant to this broad authority, the Court is not bound to follow any particular plan or method of distribution simply because it is "permissible under the circumstances." *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996). Rather, the Court may determine "a logical way to divide the money," and tailor a distribution plan accordingly. *Forex Asset Mgmt. LLC*, 242 F.3d at 331 (quoting *Durham*, 86 F.3d at 73); *see also Wealth Mgmt. LLC*, 628 F.3d at 333 ("[D]istrict courts supervising receiverships have the power to 'classify claims sensibly.'" (quoting *SEC v. Enter. Trust Co.*, 559 F.3d 649, 652 (7th Cir. 2009))).

## III.

## ANALYSIS

Approving or modifying a distribution plan falls under the Court's inherent equitable powers. *See Forex Asset Mgmt. LLC*, 242 F.3d at 331 (citing *Durham*, 86 F.3d at 72). The Court's equity

powers give it discretion to "determine the most equitable remedy" and accordingly craft a distribution plan to reach the most equitable result. *Id.* at 332. Here, the Court will exercise its discretion to modify the Receiver's proposed distribution plan. It will begin by prioritizing all claims against the Receivership Estate.

A.     *Prioritization of Claims against the Receivership Estate*

The Receiver's proposed distribution plan prioritizes claims by claimant, which she categorizes by Payee Group: (1) Qualified Professional Claims and Administrative Expenses; (2) Defrauded Investors; and (3) General Creditors Prior to Inception of the Receivership. Doc. 298, Receiver's Orig. Mot. 3–4. She argues that "when determining priority in a federal equity receivership, a certain hierarchy is established that gives certain claims a higher priority than other claims." *Id.* at 19. This hierarchy sets claims for court costs, receiver's fees, and receiver's counsel's fees above all other claims; next come administrative expenses incurred by the receiver to preserve the receivership property; then come investor claims; and finally come general creditor claims. *Id.* at 19–20. While the Receiver admits that the Court is not bound to adopt this order of priorities, she maintains that it "is commonplace for courts to effectively assign priority to the receivership's professional costs—subject, of course, to a reasonableness analysis—because these costs are necessary to discharge legal requirements, comply with the order of appointment, and pursue additional assets and position those assets for maximum return." Doc. 314, Receiver's Suppl. Accounting 12 ("The performance of these tasks is thus generally a prerequisite to the distribution of any assets to investors or vendors." (emphasis omitted)).

The Court, to some extent, agrees. There is a judicial history of adopting this framework, though it is not binding from case to case. *See, e.g., U.S. Commodity Futures Trading Comm'n v.*

*PrivateFX Glob. One*, 778 F. Supp. 2d 775, 786 (S.D. Tex. 2011) ("[For] an equitable matter in receivership proceedings arising out of a securities fraud, the class of fraud victims takes priority over the class of general creditors." (quoting *Quilling v. Trade Partners, Inc.*, No. 1:03-CV-0236, 2006 WL 3694629, at *1 (W.D. Mich. Dec. 14, 2006))); *SEC v. HKW Trading LLC*, No. 8:05-CV-1076-T-24-TB, 2009 WL 2499146, at *3 (M.D. Fla. Aug. 14, 2009) (citing Ralph Ewing Clark, *Treatise on the Law and Practice of Receivers* (3d ed. 1959)) (adopting the hierarchy of priorities listed above).

Previously, the Court rejected this hierarchy of priorities because it possibly allowed for the "victims in this case—who lost over $11 million—[to] receive as little as $52,064.39, while the Receiver, her attorneys, and other professionals—who at least had some control over the Receivership's performance—collect $870,993.31." Doc. 305, Mem. Op. & Order. 7–8. Considering the Receiver's Supplemental Accounting, the Court concludes it may now adopt this hierarchy without reaching an unfair or inequitable result. Instead of focusing on prioritization, the Court will ensure that an equitable distribution occurs by reviewing the Qualified Professional Claims and Administrative Expenses Payee Group's claims for reasonableness. *See, e.g., SEC v. Striker Petroleum, LLC*, No. 3:09-CV-2304, 2012 WL 685333, at *3–4 (N.D. Tex. March 2, 2012). If the Court concludes that this Payee Group's claims are unreasonable, it will reduce the Receiver and her Team's compensation to reach the most equitable result. *See infra* Part III.D.2.

There is one drawback with this approach. Adopting the Receiver's proposed hierarchy gives first priority to the Qualified Professional Claims and Administrative Expenses Payee Group, but does not address how to prioritize the different types of claims made by this group. Qualified Professional Claims and Administrative Expenses includes two generally distinct types of claims: (1) court costs,

receiver's fees, and receiver's counsel's fees (Qualified Professional Claims); and (2) non-professional Receivership costs (Administrative Expenses). The Receiver's proposed hierarchy prioritizes Qualified Professional Claims over Administrative Expenses, but other proposed adjustments completely disregard this prioritization. Specifically, the Receiver proposes the Court limit distributions for Qualified Professional Claims to 90%, 70%, or 50%, but sets aside $26,578.17 for winding up the Receivership, a purely Administrative Expense, essentially giving it priority over all other claims. This is inappropriate. In adopting the Receiver's proposed prioritization hierarchy, the Court also adopts the Receiver's proposed Payee Group designations that place Qualified Professional Claims and Administrative Expenses in the same Payee Group with the same priority. The Court rejects any proposed inter-Payee Group tiers of priority. Thus, the Court will not set aside money for winding up the Receivership. Instead, it will make a single distribution to the Qualified Professional Claims and Administrative Expenses Payee Group, which the Receiver may then divide to compensate any Qualified Professional Claims and cover any Administrative Expenses, including winding up costs.[6]

**B.**    *Total Value of Assets Available for Distribution by the Receivership Estate*

Second, the Court will determine the amount of assets available for distribution, which is partially unclear. In the Receiver's Original Motion, the Receiver stated that she had seized $359,904.17 in cash from Giant Petroleum and recovered $652,296.03 from the sale of personal

---

[6] The Court is aware that "the Receiver intends to personally fund the costs of the wind-up to the extent those costs exceed the $26,578.17." Doc. 314, Receiver's Suppl. Accounting 9 n.15. Because the Court is not setting aside this money for winding up the Receivership, it will not cast the Receiver in this surety role. She has no obligation to personally fund wind-up costs exceeding $26,578.17, though she may if she wishes.

property, real property, and the oil leases and wells in New Mexico for a total of $1,012,200.20 in Receivership assets. Doc. 298, Receiver's Orig. Mot. 9–10. She next explained she had paid $333,058.70 in professional fees as authorized by the Court, leaving the Receivership Estate with $681,065.35 in assets, which was further reduced when she posted a cash bond with the State of New Mexico for $64,487.18. *Id.* at 9–10, 12. As a result, at the time of the Receiver's Original Motion, "the Receivership Estate ha[d] $616,578.17 in cash" available for distribution. *Id.* at 12 (emphasis omitted).[7]

The Receiver's Supplemental Accounting, however, varies from the Receiver's Original Motion. It provides charts summarizing that the Receivership has taken in $2,290,165.04 in assets and had paid out $1,673,783.58 in liabilities (including the court-authorized $333,058.70 in professional fees and the $64,487.18 for the State of New Mexico cash bond) meaning the Receivership Estate has $616,391.46 in distributable assets. Doc. 314, Receiver's Suppl. Accounting 41–42. Though this variance is minor, the Court must reconcile it.

In doing so, the Court relies heavily upon the analysis performed by forensic accountant Frederick M. Bennett. Doc. 314-1, Ex. A, Giant Receivership Accounting 4. Based on his analysis, the Court concludes that the variance represents a small diminution in Receivership assets between the Receiver's Original Motion and the Receiver's Supplemental Accounting. According to Mr. Bennet, the Receivership has $680,878.84 available for distribution after seizing $359,904.17 cash from Giant Petroleum and generating $320,974.47 in cash flow from Receivership activities. *Id.* This

---

[7] $333,058.70 subtracted from $1,012,200.20 does not equal $681,065.35, it equals $679,141.50. Thus, after setting aside $64,487.18 for the cash bond, the Receivership Estate had $614,654.32 in cash available for distribution.

does not include a $64,487.18 reduction for the State of New Mexico cash bond. Including this reduction, Mr. Bennet's analysis indicates the Receivership has $616,391.46 in distributable assets. Because his analysis provides more granular detail than the Receiver's Original Motion, the Court concludes that it is more accurate. And because it is both more accurate and comes at a later date, it makes sense that his analysis indicates the true total of Receivership assets available for distribution following a small diminution between the Receiver's Original Motion and the Receiver's Supplemental Accounting.

One point of concern is that the generated cash flow ($320,974.47) includes reductions for prior court-authorized distributions made to pay for maintenance of personal property prior to sale ($79,282.72)[8] and professional fees ($293,415.08), totaling $372,697.80, not $333,058.70. *Id.* After considering the entirety of Mr. Bennet's analysis, the Court concludes this discrepancy arises from accounting categorizations. For simplicity, the Court will use the distribution amounts for professional fees outlined in its prior Orders ($333,058.70). Docs. 117, 205, 222, 224, 244.

Thus, the Court views the total Receivership assets as $1,013,937.34 (current cash on hand along with prior distributions); acknowledging, however, that the Receiver has already made prior distributions for professional fees and has paid out money for the State of New Mexico cash bond, it will not include these amounts in its calculation of total assets available for distribution. Therefore, the Court finds that the Receivership has $616,391.46 available for distribution—$1,013,937.34 less

---

[8] The Receiver indicates that she had previously included these maintenance costs in her professional fees calculus, but that Mr. Bennett considered them separately. Doc. 314, Receiver's Suppl. Accounting 41 n.44.

$333,058.70 for prior distributions and $64,487.18 for the State of New Mexico cash bond.[9]

C.      *Total Value of Claims against the Receivership Estate*

Third, the Court must determine what claims exist against the Receivership Estate and what claims prior distributions have already satisfied. As explained above, the Receiver's proposed distribution plan divides claims into three categories, which she refers to as Payee Groups: (1) Qualified Professional Claims and Administrative Expenses; (2) Defrauded Investors; and (3) General Creditors Prior to Inception of the Receivership. Doc. 298, Receiver's Orig. Mot. 3–4. Based on the priority of claims adopted in Part III.A, the third Payee Group will not receive any distributed assets, so the Court will not consider their claims in this subsection.

The Court will analyze the other Payee Groups' claims separately. The Court will divide the first Payee Group's claims into subgroups: (a) Qualified Professional Claims for professional fees, and (b) Administrative Expenses. It will treat claims that cannot be cleanly divided as Qualified Professional Claims (e.g., necessary administrative task performed by legal professionals). Then, the Court will calculate each subgroups' existing and satisfied claims (i.e., claims satisfied by prior distributions). Much of this analysis is unnecessary for the second Payee Group because it cannot be broken into subcategories and has received no prior distributions, meaning it has no satisfied claims. Therefore, the Court will simply calculate the second Payee Group's existing claims.

---

[9] The Receiver anticipates that the cost of plugging three remaining non-producing wells will roughly equal the value of the already-posted State of New Mexico cash bond to be recovered once the wells are plugged. Receiver's Suppl. Accounting 8 ("[B]etween $60,000 and $75,000."). Thus, the Court assumes any Receivership assets expended to plug the wells will be recouped when the bond is recovered. So for simplicity, the Court will treat the bond as a prior distribution for the Administrative Expenses of plugging the wells.

1.    Qualified Professional Claims and Administrative Expenses

The Qualified Professional Claims and Administrative Expenses Payee Group has a total of $1,000,931.88 in claims against the Receivership Estate—$603,386.00 in existing claims and $397,545.88 in satisfied claims. These claims can be divided into claims for professional fees (totaling $909,866.53) and Administrative Expenses (totaling $91,065.35). The professional fees consist of existing fee claims totaling $576,807.83[10] and satisfied fee claims totaling $333,058.70.[11] Doc 314, Receiver's Suppl. Accounting 42. The Administrative Expenses consist of existing claims totaling $26,578.17[12] and satisfied claims totaling $64,487.18.[13]

2.    Defrauded Investors

The Defrauded Investors Payee Group has a total of $11,355,000.00 in claims against the Receivership Estate. In the Receiver's Original Motion, the Receiver recommended "that the Court rely on the $11,355,000.00 total for a variety of reasons—including, most notably that this total represents the sum of money that could be verified as paid in according to the Giant books and

---

[10] The Receiver previously asserted that the existing professional fee claims totaled $585,372.57. Doc. 298, Receiver's Orig. Mot. 13, 18. Now she asserts the smaller number $576,807.83. Doc. 314, Receiver's Suppl. Accounting 42. The Court will treat the second, later amount in the Receiver's Supplemental Accounting as accurate.

The existing professional fee claims for $576,807.83 represent the total outstanding invoices for three law firms that served as Counsel to the Receiver: Wick Phillips Gould & Martin, LLP (Wick Phillips); Little Pedersen Fankhauser, LLP; and the Stephen G. Gleboff Law Group, PLLC. Doc. 298, Receiver's Orig. Mot. 13; Doc. 314, Receiver's Suppl. Accounting 42 n.46. Prior court-authorized distributions have satisfied all other professional fees claims, including the Receiver's past fee claims. See Docs. 117, 205, 222, 224, 244. Currently, the Receiver is performing all work on a "pro bono basis," so she should make no future claims for professional fees for her own time. Doc. 266, Ex Parte Seventh Status Report of the Receiver 1.

[11] Total court-authorized distributions made for professional fees. See Docs. 117, 205, 222, 224, 244.

[12] Projected costs for winding up the Receivership. Doc. 298, Receiver's Orig. Mot. 18 n.9.

[13] Cash bond treated as a prior distribution for Administrative Expenses. Supra note 9.

records and subsequently verified by the investors." Doc. 298, Receiver's Orig. Mot. 14. Specifically, she stated that during the course of the Receivership, she attempted to verify all investor contributions by forwarding verification forms to all investors identified in Giant Petroleum's books and records. *Id.* at 10. These verification forms totaled $11,410,000.00, so all but $55,000.00 of the investment amounts have been verified (less than 1%). *See id.* This total has not changed from the Receiver's Original Motion to the Receiver's Supplemental Accounting. *Compare id.* at 14, *with* Doc. 314, Receiver's Suppl. Accounting 42. Thus, the Court finds that the Defrauded Investors Payee Group's claims total $11,355,000.00.[14]

3.    Summary

Therefore, the Court finds that the Receivership has $11,958,386.00 in existing claims—$603,386.00 for Qualified Professional Claims and Administrative Expenses and $11,355,000.00 for Defrauded Investors. It also finds that the Receivership has $397,545.88 in satisfied claims for Qualified Professional Claims and Administrative Expenses.

---

[14] The Receiver proposes that the Defrauded Investors Payee Group's claims should not include approximately $8,000,000.00 in additional investor claims that she has categorized as "carried interests." Doc. 298, Receiver's Orig. Mot. 11 ("[C]arried interests are believed to have been given to certain investors whose previous investments with Giant [Petroleum] failed or were given to parties for other reasons without receiving monetary compensation for such interests."). These "carried interests" can be divided into numerous subcategories of interests: (1) $4,692,500.00 in investor-verified interests that "appear to be investments made in prior Receivership Entity well projects that were inexplicably transferred into new projects"—the Court takes this to mean investments in pre- or non-Giant Petroleum well projects that, despite being *unrelated* to Giant Petroleum, were inexplicably transferred to Giant Petroleum; (2) $145,000.00 in *unverified* interests of the same type; (3) $1,265,000.00 in investor-claimed carried interests for which there is *no record*; and (4) $1,865,000.00 in *unverified* carried interests to insiders or contractors. *Id.* at 14.

The Court agrees. The Defrauded Investors Payee Group's claims should not include carried interests. Such interests include those that are unrelated (subcategory 1), unrecorded (subcategory 3), or unverified (subcategories 2 and 4).

### D.      Reasonableness of Receiver's Actions and Claims

Next, the Court must determine whether the Receiver has acted reasonably and diligently, and whether her (and her Team's) claims for fees and expenses are reasonable. This analysis addresses two general questions: (1) whether the Receiver and her Team are entitled to fair compensation; and (2) whether to decrease, increase, or maintain the proposed amount of this compensation. This analysis does not address specific questions of the amounts to be distributed for individual fee applications made by members of the Receivership Team (i.e., professionals in the Qualified Professional Claims and Administrative Expenses Payee Group). It simply assists the Court in better crafting "a logical way to divide the money," and tailoring a distribution plan given the reasonableness of the proposed compensation for the Receivership Team. *See Forex Asset Mgmt. LLC*, 242 F.3d at 331 (quoting *Durham*, 86 F.3d at 73). After a distribution plan is established, unpaid professionals will need to submit fee applications for their requested fees. *See, e.g.*, Doc. 302, Little Pedersen Fankhauser, LLP's Fee Appl. Then, the Court will analyze each application individually before ordering distributions.

### 1.      Entitlement to Fair Compensation

"A receiver appointed by a court who reasonably and diligently discharges his duties is entitled to be fairly compensated for services rendered and expenses incurred." *Striker Petroleum, LLC*, 2012 WL 685333, at *2 (quoting *SEC v. Byers*, 590 F. Supp. 2d 637, 644 (S.D.N.Y. 2008)); *see also SEC v. Elliot*, 953 F.2d 1560, 1577 (11th Cir. 1992) ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation."). This includes fees and expenses incurred for professional services. *See, e.g.*, *SEC v. W. L. Moody & Co., Bankers (Unincorporated)*, 374

F. Supp. 465, 484–86 (S.D. Tex. 1974), *aff'd*, 519 F.2d 1087 (5th Cir. 1975). In this case, that would include the professional service fees of members of the Receivership Team. Thus, when the Court refers to the Receivership Team's compensation, it is referring to the Qualified Professional Claims and Administrative Expenses Payee Group's claims, which by definition encompass receiver's fees and receiver's counsel's fees. The Court will treat the two as synonymous.

To be entitled to compensation, the Receiver must have reasonably and diligently discharged her duties. *See Striker Petroleum, LLC*, 2012 WL 685333, at *2. These duties included: collecting, marshaling, and taking possession or control of assets under the possession or control of the Receivership Estate, as well as performing all acts necessary to conserve, hold, manage, and preserve the value of the Receivership estate. Doc. 8, Order Appointing Receiver 3, 5.

During the Course of the Receivership, the Court has questioned whether the Receiver was effectually discharging these duties because the Receivership was achieving poor results. *See, e.g.*, Doc. 213, Order Appointing Examiner 1; Doc. 264, Order 1 (expressing concerns that Receivership's goals had not been realized); Doc. 267, Order 1 ("[T]he Receiver has yet to provide the Court with evidence that her efforts have been or will be fruitful or instead are unnecessarily depleting the remaining Receivership assets.").

The Receiver maintains that she discharged her duties, but that the atypical nature of the Receivership made it difficult to achieve positive results. Doc. 314, Receiver's Suppl. Accounting 2. Primarily, she argues that she had a duty to remedy "environmental and regulatory violations" associated with certain New Mexico oil wells, which conflicted with her duties to marshal and maintain assets for the Receivership Estate. *Id.*; *see also id.* at 18–23. She maintains that this former duty, though costly, was unavoidable and took priority over the latter duties.

- 16 -

Generally, "in cases of non-compliance with SEC regulations, a receiver may be appointed to prevent the corporation from dissipating corporate assets and to pay defrauded investors." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 306 (5th Cir. 2012); *see also Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966 n.11 (5th Cir. 2012) ("[A] primary purpose of appointing a receiver is to conserve the existing estate . . . . Receivers are directed to marshal the assets of the defendant, and prevent the dissipation of [the] defendant's assets pending further action by the court." (quoting *Eberhard v. Marcu*, 530 F.3d 122, 131–32 (2d Cir. 2008))); *Wealth Mgmt. LLC*, 628 F.3d at 334 ("The goal in both securities-fraud receiverships and liquidation bankruptcy is identical—the fair distribution of the liquidated assets.").

To the contrary, the Receiver argues that under 28 U.S.C. § 959(b), "[i]n the case of a business operating illegally in a highly regulated industry, a primary duty of the receiver, antecedent to formulating a plan for distribution, is the fulfillment of legal and regulatory obligations." Doc. 314, Receiver's Suppl. Accounting 19–20 ("[T]he dictates of § 959(b) do not provide a receiver with the luxury of simply abandoning property which is out of compliance as a means to save resources.").

She is correct. The Fifth Circuit, in *H.L.S. Energy Co., Inc. v. Lowe (In re H.L.S. Energy Co., Inc.)* 151 F.3d 434 (5th Cir. 1998), applied section 959(b) to prohibit a bankruptcy trustee from abandoning an unproductive oil well, leaving it unplugged in violation of Texas law. *Id.* at 438. This is because a receiver appointed in any civil action involving property (real, personal, or mixed) situated in a different district gains complete jurisdiction, control, and a right to take possession over any such property. 28 U.S.C. § 754. But upon taking possession of property, the receiver shoulders the burden of managing and operating the property "according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor

- 17 -

thereof would be bound to do if in possession thereof." 28 U.S.C. § 959(b). This means that federal receivers must comply with state law, and cannot abandon property if doing so would violate it. *In re H.L.S. Energy Co., Inc.*, 151 F.3d at 438.

Here, New Mexico regulatory law clearly requires oil well operators to plug wells prior to abandoning them. N.M. Admin. Code § 19.15.25. Thus, the Receiver had to comply with New Mexico law and could not simply abandon the oil wells. Therefore, the Court concludes that discharging her duty to remedy environmental and regulatory violations did not result in a breach of her other duties to marshal and maintain assets for the Receivership Estate. Accordingly, the Receiver reasonably and diligently discharged her duties and is entitled to fair compensation. *See Striker Petroleum, LLC*, 2012 WL 685333, at *2.

2.    Adjustment of Fair Compensation

Fair compensation means moderate compensation, not complete compensation. *See id.*; *Byers*, 590 F. Supp. 2d at 645 ("In considering applications for compensation by receivers and their attorneys, the courts have long applied a rule of moderation, recognizing that 'receivers and attorneys engaged in the administration of estates in the courts of the United States . . . should be awarded only moderate compensation.'" (quoting *In re New York Investors, Inc.*, 79 F.2d 182, 185 (2d Cir. 1935))). The amount of compensation to be awarded a court-appointed receiver is within the Court's discretion. *Byers*, 590 F. Supp. 2d at 644 (citing *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994); *United States v. Code Prods. Corp.*, 362 F.2d 669, 673 (3d Cir. 1966)).

In exercising that discretion, the Court may consider any factor related to the Receivership, including, *inter alia*, "the complexity of problems faced, the benefits to the receivership estate, the quality of the work performed, and the time records presented." *Byers*, 590 F. Supp. 2d at 644

(quoting *SEC v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973)); *see also Code Prods. Corp.*, 362 F.2d at 673 ("In allowing fees the considerations are the time, labor and skill required, but not necessarily that actually expended, in the proper performance of the duties imposed by the court upon the receivers, the fair value of such time, labor and skill measured by conservative business standards, the degree of activity, integrity and dispatch with which the work is conducted and the result obtained.") (quotation and quotation marks omitted).

With this in mind, the Court will consider: (1) the complexity of the problems faced by the Receivership Team; (2) the time, labor, and skill necessary for the job; (3) the results achieved; (4) the time it took to achieve those results; and (5) the ability of the Receivership Estate to afford the requested fees and expenses. *See Striker Petroleum, LLC*, 2012 WL 685333, at *3 (citing *W.L. Moody*, 374 F. Supp. at 480–83).

Before beginning, the Court reiterates that it is not making a final determination on the reasonableness or value of any individual distributions to members of the Receivership Team. The Court will not do this until it receives formal fee applications. Instead, the Court's analysis focuses on crafting the most equitable distribution plan. The Receiver proposes a distribution plan that would pay 90%, 70%, or 50% of the Qualified Professionals Payee Group's outstanding claims. After analyzing each factor, the Court will decide whether this proposed distribution framework—or a modified framework—best provides the Receivership Team with fair compensation.

i.     *Complexity of Problems Faced by the Receivership Team*

Numerous problems have cropped up over the course of the Receivership. At the outset, when the Receiver took possession of Giant Petroleum, she found that the company records were "woefully incomplete and inaccurate." Doc. 298, Receiver's Orig. Mot. 1. The Receivership Team

then faced the daunting task of reconstituting and running an "unprofitable business for the several years it took to untangle and correct a Gordian knot of environmental and regulatory violations." Doc. 314, Receiver's Suppl. Accounting 2. While doing this, she obtained a judgment to recover $240,000 from the American Cancer Society only to have this judgment appealed to and reversed by the Fifth Circuit. *Id.* at 29; *see also American Cancer Soc. v. Cook*, 675 F.3d 524 (5th Cir. 2012). Also, she expended time, effort, and resources to sell the Matagorda 3 wells for an estimated minimum of $1,000,000.00, but only managed to recover $470,000.00 due to a series of unfortunate setbacks. Doc. 314, Receiver's Suppl. Accounting 5 & n.6. Based on this, it is clear that the Receivership Team has faced a "complex and difficult Receivership." *See* Doc. 224, Mem. Op. & Order 5. Thus, the Court concludes this factor weighs in favor of maintaining or increasing the Receivership Team's compensation.

> ii.    *Time, Labor, and Skills Necessary for the Job*

In determining fair compensation, the Court will look at the time expended on the Receivership, the type of work performed, and the necessary skills to perform that work. In considering the necessary skills to perform that work, the Court will also consider the ability, reputation, and professional qualities of the Receiver and assisting professionals necessary for the job. *See W.L. Moody & Co.*, 374 F. Supp. at 481 (holding receiver's and receivership team's qualifications relevant to fee awarded).[15]

> a.    Time

Previously, the Court has evaluated billing records found in the multiple fee applications

---

[15] While the Court could consider this as a separate factor, organizationally, it makes more sense to consider it as part of its "Time, Labor, and Skills" analysis.

made over the duration of the Receivership. *See, e.g.*, Doc. 101, First Interim Fee Appl. (requesting fees through January 31, 2010); Doc. 197, Second Interim Fee Appl. (requesting fees through October 31, 2010); Doc. 243, Fee Appl. for Freeman Resource Group (requesting fees for certain expenses incurred from November 1, 2010, to December 31, 2010). From these, the Court has a view of the time expended on the Receivership. Doc. 224, Mem. Op. & Order 5 ("Based on the Receiver's submissions up to this point, it is clear that the Receiver and [her Team] have expended hundreds of hours in furtherance of a complex and difficult Receivership."). Given the complexities and difficulties of this Receivership, the Court concludes that the time expended on it was reasonable.

> b.    Labor

The Receiver lists the labor performed by her and her Team in prior fee applications and in the Receiver's Supplemental Accounting. *See, e.g.*, Doc. 314, Receiver's Suppl. Accounting 15–17 (listing the "administrative duties performed or facilitated by the three successive Receivership law firms"). Given the unique nature of the Receivership, the Receiver has needed to retain firms skilled in areas of, *inter alia*, New Mexico regulatory law, oil and gas, securities fraud, forensic accounting, and receivership. *See Stuart v. Boulware*, 133 U.S. 78, 82 (1890) (holding that compensation usually "corresponds with the degree of responsibility and business ability required"). The following list details the labor associated with this Receivership:

- Karen Cook, Receiver: "[T]he Receiver coordinated and managed a multi-disciplinary team of skilled Professionals and participated personally in managing and operating the oil well properties, seizing documents, computers and other equipment, real property, personal property, bank accounts, and more." Doc. 197, Second Interim Fee Appl. 17. Ms. Cook has previously served as a receiver and as counsel for other court-appointed receivers. Doc. 101, First Interim Fee Appl. 15.

- Wick Phillips, Counsel to the Receiver: Wick Phillips served as counsel to the

Receiver from the Receivership's inception through March 31, 2011. Doc. 298, Receiver's Orig. Mot. 13. During that time, Wick Phillips served as "lead trial counsel to the Receiver," "represented the Receiver in all proceedings in this case," and represented the Receiver as "principal counsel on non-litigation matters." Doc. 101, First Interim Fee Appl. 17. This "required expertise in a wide range of legal subject matters, including bankruptcy, marital property rights, labor and employment, securities, landlord-tenant, real estate, banking, trust law, liens, tax law, fiduciary issues, insurance, and private equity." *Id.*

- LSS&M, LLP, Accounting and Insolvency Consulting Services: "LLS&M has reviewed, and continues to analyze, company books and records, including electronic and paper-based evidence. They have worked to determine the total number of investors and the total amount of investor dollars received." *Id.* at 19.

- Ralph S. Freeman, Freeman Resource Group: "The Receiver utilized the services of Ralph S. Freeman . . . , a consultant experienced in receiverships, to conduct an investigation into Defendants' activities and to search for Defendants' assets. In addition, Mr. Freeman has assisted the Receiver with virtually all property issues, and factual investigations including witness interviews." Doc. 243, Fee Appl. for Freeman Resource Group 5.

- Protegga LLC, Computer Forensics and Data Recovery Specialist: "The Receiver utilized the services of Protegga, LLC, . . . to preserve and maintain Defendants' computer and technology infrastructure, including electronic mail, accounting files, investor lists, and various other records kept only in electronic format." Doc. 101, First Interim Fee Appl. 20.

- Little Pedersen and Fankhauser LLP (LPF), Counsel to the Receiver: LPF served as counsel to the Receiver from April 1, 2011, through September 30, 2011. Doc. 298, Receiver's Orig. Mot. 13. Approximately half of LPF's legal services related to the Receiver's "appeal of this Court's Judgment in favor of the Receiver with respect to her claims against the American Cancer Society." Doc. 302-1, Decl. of John J. Little (Little Decl.) ¶ 5. And the other half related to LPF's "work as lead counsel for the Receiver," *id.* ¶ 6, which involved work similar to that performed by Wick Phillips. *See generally id.*, Exs. 1–5 (LPF invoices).

- Stephen G. Gleboff Law Group, PLLC, Counsel to the Receiver: Stephen Gleboff served as counsel to the Receiver from October 1, 2011, through June 12, 2015. Doc. 298, Receiver's Orig. Mot. 13; *see also* Doc. 309, Order. The Court assumes this involved work similar to that performed by LPF as Mr.

> Gleboff was a partner there and worked on the Receivership when LPF was counsel to the Receiver. Doc. 302-1, Little Decl. ¶ 8. Mr. Gleboff has over twenty years of experience as a business and commercial litigator, and has particular expertise in securities litigation. *Id.*

At this time, the only outstanding professional fees are the fees of the three counsels to the Receiver. The work performed by counsel to the Receiver appears to have required expertise in different areas of the law, outlined above, but did not require premium work or specialization that few attorneys possess. Knowing this, the Court can predict without deciding what a reasonable hourly rate for the Receivership Team's labors should be.

A reasonable hourly rate is the market rate in the legal community for similar services by lawyers of comparable skill, experience, and reputation. *SortiumUSA, LLC v. Hunger*, No. 3:11-CV-1656, 2015 WL 179025, at *3 (N.D. Tex. Jan. 14, 2015). The relevant community for determining the market rate is the community where the district court sits. *Id.* (citing *Tollett v. City of Kemah*, 285 F.3d 357, 369 (5th Cir. 2002)). Other district courts in the Northern District of Texas have found reasonable hourly rates for attorneys of comparable skill, experience, and reputation to range from $100 to $400 dollars. *See, e.g.*, *Powell v. ProCollect, Inc.*, No. 11-CV-0846, Dkt. No. 30 (N.D. Tex. July 17, 2012) (finding hourly rates from $100 to $400 per hour to be reasonable in this community). Generally, fee awards for rates above $500 per hour are reserved for "specialized tasks in complex cases that few attorneys are capable of handling." *SortiumUSA, LLC*, 2015 WL 179025, at *9 (citing *Fluor Corp. v. Citadel Equity Fund Ltd.*, No. 3:08-CV-1556, 2011 WL 3820704, at *5 (N.D. Tex. Aug. 26, 2011) (Boyle, J.) (collecting cases with hourly rates ranging to $510 for senior partners performing premium work requiring specialized qualifications)). While the problems faced by the Receivership Team here were complex and difficult, they did not require specialized

qualifications or premium work. Accordingly, the Court concludes that a reasonable hourly rate for the Receiver and her counsel should likely fall between $100 and $400 per hour.

So far in this case, the Court has had the opportunity to review the hourly billable rates for the Receiver, Wick Phillips, and LPF. It has not reviewed the hourly billable rates for the Stephen G. Gleboff Law Group, though it might predict that Mr. Gleboff would continue to bill at a rate similar to the rate billed for his work at LPF.

Previously, the Receiver billed at a rate of $400 per hour. Doc. 101-2, Ex. B, Receiver's Billing Invoice 12. In May 2013, the Receiver indicated to the Court that she "long ago determined to complete her duties on a *pro bono* basis." Doc. 266, Ex Parte Seventh Status Report of the Receiver 1. Attorneys at Wick Phillips billed at a maximum rate of $395 per hour, with a majority of the work being billed at a rate of $250 per hour. Doc. 101-2, Ex. C, Wick Philip's Billing Invoice 20. And the attorneys at LPF billed at a maximum rate of $475 per hour (Mr. Gleboff's rate), with a majority of the work being billed at lower rates of $260 per hour or $175 per hour. Doc. 302, Little Pedersen Fankhauser, LLP's Fee Appl. 5–6. At LPF, Mr. Gleboff worked a total of 87.5 hours on the Receivership. *Id.* at 5. Of this time, he provided 76 hours (approximately 87% of his time) at a 10% discounted rate, and provided 4.3 hours (approximately 5% of his time) without charge. *Id.* at 5 & n.5. With these reductions, he essentially billed at a rate of $410 per hour.[16] *See id.* Therefore, all

---

[16] Dividing the total fees generated ($35,910.00) by the total number of hours billed (87.5) results in an effective rate of $410.40 per hour.

Billing 87.5 hours at $475 per hour generates $41,562.50 in fees. Billing 76 hours at $475 per hour generates $36,100.00 in fees; whereas billing 76 hours at $427.5 per hour ($475 per hour discounted by 10%) generates $32,490.00 in fees, for a difference of $3,610.00. Billing 4.3 hours at $475 per hour generates $2,042.50 in fees, for which LPF did not charge. Reducing the overall possible fee ($41,562.50) by the amounts discounted ($5652.00—$3,610.00 plus $2,042.50) results in $35,910.00 in fees. To generate $35,910.00 in fees while billing 87.5 hours requires an hourly rate of $410.40 per hour.

Receiver's counsels' fees fall within the prescribed range except for Mr. Gleboff's rate at LPF, which is marginally outside of it. Mr. Gleboff's rate at the Stephen G. Gleboff Law Group remains unknown.

      c.      Skills (including ability, reputation, and professional qualities)

As outlined above, the Receiver, all three of her lead counsel, as well as her accountants, consultants, and computer specialists were all well-qualified. Many had prior experience or specialization with receiverships, and those that didn't had years of experience in comparable areas of the law (or their respective field).

      d.      Conclusion

The Court recognizes that much time has been expended on this Receivership; that the time expended has been reasonable given the complexities of the work; that the majority of the labor performed in furtherance of the Receivership was billed at a presumably reasonable rate;[17] and that the skills, ability, reputation, and professional qualities of the Receiver and her Team clearly indicate a high level of experience and expertise. Additionally, the Receiver represents that she ensured that the professionals she employed performed only tasks that "were necessary to the administration of the estate," and in doing so, used the "least expensive personnel suitable to a given task." Doc. 314, Receiver's Suppl. Accounting 25 n.37. The Court approves. Accordingly, the Court concludes that this factor also weighs in favor of maintaining or increasing the Receivership Team's compensation.

      iii.      *Results Achieved*

Much of the Receiver's Supplemental Accounting focuses on explaining why the Receivership has achieved poor results, including: (1) incurring over $1,000,000.00 in "Oil Well Project Expenses"

---

[17] Because the Receivership Estate lacks the assets to fully cover all requested fees and expenses, all billing overages will have no real effect. *See infra* Part III.D.2.v. Members of the Receivership Team will receive, at most, a percentage of their fees.

to run and reconstitute an unprofitable business in the hopes that its assets would sell at a premium, Doc. 314, Receiver's Suppl. Accounting 41; (2) obtaining only "$470,000.00, substantially less than the experts had predicted," for the sale of multiple producing oil wells located in New Mexico, *id.* at 5–6 & n.7 ("The oil wells were . . . the only substantial source of revenue to compensate the defrauded investors."); and (3) expending tens of thousands of dollars in Receivership assets on a failed attempt to recover $240,000.00 donated to the American Cancer Society. *Id.* at 17 n.26; *see also American Cancer Soc.*, 675 F.3d 524.

a.       Oil Well Project Expenses

First, the Court considers the $1,084,742.63 in Oil Well Project Expenses. *See* Doc. 314, Receiver's Suppl. Accounting 41. The Receiver incurred these expenses by continuing Giant Petroleum's oil well operations. According to the Receiver, "the operations of the oil properties had to be sustained in order to preserve whatever value those assets had." Doc. 298, Receiver's Orig. Mot. 1. From her perspective, well operations were necessary to create a production history, which was necessary to ascertain an accurate value of the properties. *See id.* But the Receiver had two available alternatives. She could have sold the oil properties, as is, for a lower price. *See* Doc 72., Receiver's First Status Report 18–19. Or she could have brought the oil wells into compliance with any New Mexico regulations[18] and then abandoned them. *See* Doc. 274, Pl.'s Notice 2 ("[I]f the Court closes the Receivership now—in which case the Receiver would presumably have to abandon the wells—the amount available to pay claims would be less than 2%, or less than two cents on the dollar."). *But see* Doc. 298, Receiver's Orig. Mot. 18 ("If the Court chose to set aside 50% of what

---

[18] Though it is unclear how much this would have cost, the Receiver asserts that it "cost the Receivership at least $300,000," not including legal fees. Doc. 314, Receiver's Suppl. Accounting 34.

is owed for these costs and expenses . . . each investor would receive approximately 2.61% of his or her investment back.").

Previously, the Court suggested shutting down the Receivership, *see* Doc. 305, Mem. Op. & Order 7, to which the Receiver responded that this was never an option without first resolving all regulatory violations. Doc. 314, Receiver's Suppl. Accounting 20 n.32 (viewing the Court's suggested alternative as an "observation . . . articulated as a rhetorical device."). This suggestion was not a "rhetorical device." From the Court's perspective, selling the properties for a lower price after disclosing all regulatory violations would have been a viable approach; as would bringing the properties into compliance and abandoning them at a minimal loss. Though conjectural, these alternatives demonstrate that there was a possibility that this Receivership could have reached substantially similar results more expediently. The Court recognizes that it allowed the Receivership to continue; that it is easier to judge the Receiver's decisions from the vantage of hindsight; and that the Receiver mitigated losses by generating $815,292.73 in oil well operations revenue; however, none of these change the fact that the Receiver's decisions and actions lent to poor results.

b.    Matagorda 3 Joint Venture Wells

Next, the Court considers the sale of the Matagorda 3 Joint Venture Wells. In May 2013, the Receivership reported that these wells would sell for at least $1,000,000.00. Doc. 314, Receiver's Suppl. Accounting 5 n.6. In December 2013, when the wells sold, the Receivership collected the drastically lower amount of $470,000.00. *Id.* at 5. The Receiver says that this over-$500,000.00 discrepancy resulted from: (1) the mis-appraisals of two independent New Mexico oil and gas experts, who predicted the sale value during the height of the oil price boom; (2) a sudden, sharp decline in well production just as oil prices also began to decline; and (3) the myriad statutory and regulatory

violations that the Receivership had to navigate before selling the wells. *Id.* at 5–6, 31–32 ("The Receiver . . . spent five years holding and managing the properties of the estate, preserving value by identifying the oil wells which were marketable, . . . then finding a way to bring them all into compliance with state law, [and] then by operating the productive wells and plugging the non-producing wells."). The Court understands that the Receiver could not have controlled the mis-appraisals, the decline in the market, the decline in oil production, or the wells' initial state of regulatory noncompliance. This does not change that the Receiver sold the Receivership's largest liquidated assets for less than half of their projected value.

<blockquote>c.     American Cancer Society Donation</blockquote>

Finally, the Court considers the attempt to recover $240,000.00 donated to the American Cancer Society. In doing so, the Court relies heavily upon the Fifth Circuit's opinion, *American Cancer Society v. Cook*, which details why the Receiver was unsuccessful in recovering this money as a fraudulent transfer. 675 F.3d 524.

Shortly after her appointment, the Receiver discovered a series of donations (totaling $240,000.00) made to the American Cancer Society, and through a series of motions sought to recover them for the Receivership estate. *Id.* at 527. This Court, adopting the findings and conclusions of a magistrate judge, held that the funds were recoverable as fraudulent transfers. *Id.* Key to this holding was a factual conclusion that Giant Petroleum had operated a Ponzi-like scheme, which created a presumption that Giant Petroleum made the donations with fraudulent intent. *See id.* The Court based this factual conclusion solely on an affidavit with attached exhibits provided by the Receiver. *Id.* at 528. The Fifth Circuit held that content of the Receiver's affidavit was highly conclusory and thus depended on the data in the exhibits. *Id.* Then it held that the exhibits in no

way demonstrated that investor funds demonstrated a Ponzi-like scheme. *Id.* As a result, it reversed this Court for clear error. *Id.* ("The absence of even a single investor 'payout'—which would be, by its nature, easy to show—convinces us the district court erred in placing determinative weight on Cook's declaration that Giant operated as a Ponzi scheme.").

Arguably, the Receiver's recovery attempts were not discretionary. Doc. 8, Order Appointing Receiver 3–4 ("[T]he Receiver is *specifically directed* and authorized to . . . . [i]nstitute such actions or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate.") (emphasis added). According to the Receiver, she spent "over $30,000 in legal fees—a very reasonable charge for circuit court appellate work and *an expense which was unavoidable*." Doc. 314, Receiver's Suppl. Accounting 17 n.26 (emphasis added). But generally a Receiver has an obligation to expend Receivership funds in a reasonable and cost-effective manner. *See* Doc. 8, Order Appointing Receiver 5 (directing Receiver to "[p]reserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants").

With this in mind, the Receiver could have elected to forgo bringing the fraudulent transfer action against the American Cancer Society if she characterized it as an unreasonable or cost-ineffective use of Receivership funds. She also could have proceeded by engaging counsel on a contingency basis. This reduces return, but also minimizes risk. Either approach would have achieved a better result.

### d.   Conclusion

The Court recognizes that many of these poor results occurred despite the Receiver's best efforts. The Receiver argues that because of her best efforts, she should not receive a reduced

compensation. Doc. 314, Receiver's Suppl. Accounting 26 ("Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation." (quoting *Elliott*, 953 F.2d at 1577)). The Court disagrees. This rule of law addresses entitlement to compensation. It does not address the equitable concerns raised in the Court's Memorandum and Opinion Order requiring a supplemental response. *See* Doc. 305, Mem. Op. & Order 7 ("[P]erhaps the most troubling part of the Receiver's proposal is that it seeks to place all of the Receivership's failures, not on the people at the helm of the Receivership, but on a group of passive observers who have already had their investments squandered."). As explained above, the Receiver is entitled to compensation. This factor fits within the analysis of whether this compensation should be increased, decreased, or maintained. Unfortunately, despite the Receiver's best efforts, the Receivership achieved poor results. This weighs in favor of decreasing the Receivership Team's compensation.

iv.    *Time Taken to Achieve Results*

Because courts may consider all factors involved in a particular receivership, and given the prolonged nature of the Receivership here (almost seven years), the Court will also consider the time it took the Receivership Team to achieve the results described in the previous subsection. The majority of liquidation sales revenue accrued within the first two years of the Receivership. *See* Doc. 314-1, Ex. D, Sale of Real Property (totaling $415,802.10 in real property sales by end of 2010); *id.*, Ex. E, Sale of Vehicles (totaling $108,500.00 in vehicle sales by end of 2010); *id.*, Ex. F, Sale of Personal Property (totaling $107,712.62 in personal property sales by end of September of 2011, the Receivership two-year mark). *But see* Doc. 286, Status Report of Receiver (totaling $470,000.00 for the sale of Matagorda 3 in December 2013). On the other hand, the Receivership accrued a

substantial amount of costs associated with continued operation of the oil properties after the first two years. *See* Doc. 314-1, Ex. J, Oil Well Project Expenses (totaling more than $371,000.00 in costs after September 2011). Touching again on the alternatives discussed above, had the Receiver sold the oil properties, as is, for a lower price, or brought the wells into compliance with New Mexico regulations and then abandoned them, the Receivership possibly could have achieved results similar to the results it has achieved, but could have done so five years sooner. This alone would have netted investors a greater recovery from the Receivership simply because of the time value of money. Therefore, the Court concludes that the protracted nature of this Receivership weighs in favor of decreasing the Receivership Team's compensation.

v.     *Ability of the Receivership Estate to Afford Requested Fees and Expenses*

Based on Parts III.B and III.C above, the Court finds that the Receivership Estate cannot possibly afford the requested fees and expenses. The Receivership Estate has $616,391.46 available for distribution but $11,958,386.00 in existing claims—$603,386.00 for Qualified Professional Claims and Administrative Expenses and $11,355,000.00 for Defrauded Investors.

The Receivership Estate could afford the Qualified Professional Claims and Administrative Expenses Payee Group's claims (i.e., the Receivership Team's compensation), but this would consume almost 98% of the assets available for distribution. This result is inequitable to the Defrauded Investors. Recognizing this, the Receiver has proposed that the Court distribute funds for 90%, 70%, or 50% of the Qualified Professional Claims and Administrative Expenses Payee Group's claims and distribute all remaining funds to the Defrauded Investors. But as previously explained by this Court, even a 50% reduction still reaches an inequitable result. *See* Doc. 305, Mem. Op. & Order 7–8. Accordingly, the Court concludes that this factor weighs in favor of decreasing the

Receivership Team's compensation.

> *vi.    Conclusion*

Considering the totality of the circumstances, including the factors listed above, the Court concludes that equity requires the Court to reduce the Receivership's Team, even beyond a 50% reduction. The Receivership was complex and required much time, labor, and skill, but it reached a poor result after an unreasonably long time. This unreasonably long time helped generate additional costs that should not be passed on to the Defrauded Investors. Instead the Receiver and her Team should bear the burden. As noted by the SEC:

> In agreeing to work for the Receiver, these professionals were on notice, based upon the nature of the case and the work to be performed, that the ultimate value of the estate might not be enough to pay the full amount of their billed fees and expenses. Therefore, they agreed to work bearing the risk that they would receive only partial payment on their invoices.

Doc. 274, Pl.'s Notice 3. Accordingly, the Court will decrease the Receivership Team's compensation as explained below in Part III.E (Distribution Framework).

## E.    *Distribution Framework*

The Court has already determined the priority of claims. *Supra* Part III.A. Now it must determine a distribution framework given that prioritization scheme. The Court may craft and propose a distribution framework based on the facts and equitable considerations of the particular case. *See Forex Asset Mgmt. LLC*, 242 F.3d at 331 (citing *Durham*, 86 F.3d at 73). This distribution framework simply must provide "a logical way to divide the money." *Id.* Here, the Court will first propose an equitable decrease in the Receivership Team's compensation that reaches the most equitable result based on the analysis in Part III.D. Second, it will adopt a distribution methodology.

In decreasing the Receivership Team's compensation, the Court will consider prior court-

authorized distributions. *See Striker Petroleum, LLC*, 2012 WL 685333, at *4 ("Taking into account the fees and expenses awarded to the Receiver in response to his first and second applications . . ."). Incorporating prior distributions, the requested fees and expenses for the Qualified Professional Claims and Administrative Expenses Payee Group total $1,000,931.88—$603,386.00 in existing claims and $397,545.88 in satisfied claims. The Receiver has proposed paying 90%, 70%, or 50% of the existing claims, and has already paid 100% of the satisfied claims. Doc. 298, Receiver's Orig. Mot. 17–18. Because the Receiver has already paid the satisfied claims, reducing the existing claims by 50% would require paying out $699,238.88. This is effectively 70% of the total fees and expenses requested by this Payee Group over the course of the Receivership ($1,000,931.88), and is effectively 70% of the total recovery of $1,013,937.34—$616,391.46 available for distribution and $397,545.88 in satisfied claims. It would leave $314,698.46 for distribution to the Defrauded Investors, affording them approximately 2.7% of their claims. This is why a 50% reduction of just the existing claims would not reach an equitable result for the Defrauded Investors.

Other fee awards made by judges of this court have allowed for distributions of 30% or less of the total recovery for total requested fees and expenses. *See, e.g., Striker Petroleum, LLC*, 2012 WL 685333, at *4 (allowing requested fees and expenses that totaled less than 15% of the total recovery of more than $5 million) (Fitzwater, J.); *SEC v. Megafund Corp.*, No. 3:05-CV-1328, 2008 WL 2839998, at *2 (N.D. Tex. June 24, 2008) (Lindsay, J.) (22.4% of total recovery of $3.1 million); *SEC v. Funding Res. Grp.*, No. 3-98-2689, 2004 WL 2583636, at *2 (N.D. Tex. Nov. 12, 2004) (Kaplan, J.) (less than 30% of total recovery of more than $5 million), *rec. adopted*, 2004 WL 2964992 (N.D. Tex. Dec. 20, 2004) (Lynn, J.). But these cases dealt with multi-million dollar total recoveries in complex, but typical, receiverships. The Receivership here was complex, problematic,

and atypical. *See* Doc. 224, Mem. Op. & Order 5.

Other judges of this court have also considered the percentage each investor will receive of their claim. *See, e.g., Megafund Corp.*, 2008 WL 2839998 ("[Each claimant with an approved claim will receive approximately 36.25% of their claim."); *Funding Res. Grp.*, 2004 WL 2583636, at *2 ("[E]ach claimant will receive approximately 5.7% of their claim."), *rec. adopted*, 2004 WL 2964992. Here, if the Court distributed all available assets to the Defrauded Investors, they would receive approximately 5.4% of their claims.

Keeping both principles in mind, the Court concludes that the most equitable result is to pay the Qualified Professionals and Administrative Expenses Payee Group 50% of their total claims (existing and satisfied): $500,465.94—$1,000,931.88 multiplied by 50%[19]—which is approximately 50% of the total recovery.[20] Currently, this Payee Group has received $397,545.88 in prior distributions, so it is entitled to $102,920.06 of the final distribution. This leaves $513,471.40 for distribution to the Defrauded Investors Payee Group. As a result, each claimant with an approved claim of that Payee Group will receive approximately 4.5% of their claim.

All distributions will be made under a *pro rata* methodology, including those for professional fees. The Fifth Circuit has approved *pro rata* distributions as permissible equitable remedies in Receivership cases. *See Forex Asset Mgmt. LLC*, 242 F.3d at 331; *see also Durham*, 86 F.3d at 71. The Receiver suggested that a *pro rata* approach would provide the most equitable distribution (at least

---

[19] This approach modifies the Receiver's original suggestion of distributing 50% of all existing claims to account for previously satisfied claims (i.e., prior distributions made at 100%).

[20] This is not to say that a distribution for fees and expenses that is approximately 50% of the total recovery is always appropriate in complex, problematic, or atypical receiverships. The Court's equitable determination focuses on the highly nuanced facts of this Receivership, and cannot necessarily be applied outside of that context.

for investors). Doc. 298, Receiver's Orig. Mot. 21 (collecting cases). And this Court agrees. "Distribution of assets on a pro rata basis ensures that investors with substantively similar claims to repayment receive proportionately equal distributions." *Wealth Mgmt. LLC*, 628 F.3d at 333 (holding *pro rata* distribution particularly appropriate where funds are commingled, investors are similarly situated, and recoverable assets in a receivership are insufficient to fully repay the investors). Here, "investor funds were commingled," all investors are similarly situated, and the Receivership Estate is clearly not large enough to fully repay all investors. Doc. 298, Receiver's Orig. Mot. 21–22. Thus, the distribution plan should provide for *pro rata* distribution to the Defrauded Investors.

This logic extends to claims for professional fees. *See* Doc. 298, Receiver's Orig. Mot. 3 ("The Qualified Professionals retained by the Receivership Estate would each receive a *pro rata* distribution based on his/her outstanding balances."). Given the similarly situated nature of members of the Qualified Professional Fees and Administrative Expenses Payee Group and the limited assets of the Receivership Estate, a *pro rata* distribution makes the most logical sense. That being said, a *pro rata* approach must also consider the prior distributions of professional fees awarded in this case, not just Qualified Professionals' "outstanding balances." *Id.* The Court will not ask for the return of assets already distributed for fee payments, but will take into account if the lion's share of any one claimant's fees have already been paid through prior distributions. The most equitable distribution plan will attempt to pay existing claims to professionals for the work they have completed, but not overpay given distributions already received.

To summarize, the Court concludes that the most equitable distribution of the remaining $616,391.46 available for distribution would be $102,920.06 to the Qualified Professional Claims and Administrative Expenses Payee Group and $513,471.40 to the Defrauded Investors. All distributions

are to be made under a *pro rata* distribution methodology.

**F.**   *Conclusion*

To provide the most equitable distribution for all interested parties, the Court balances the interests of the Qualified Professional Claims and Administrative Expenses Payee Group and the Defrauded Investors Payee Group. The Court recognizes that the Receivership Team's efforts were necessary for there to be a distribution in this case. Yet at the same time, through no fault of their own, the Receivership Team did not achieve the best results. With a less-than-expected total recovery, the Court must make the difficult decision of distributing less funds to the Qualified Professional Claims and Administrative Expenses Payee Group than requested by the Receiver. From the beginning, the goal of this Court has been to ensure that the Defrauded Investors receive the largest distribution possible within the confines of equity. Equity demands the Qualified Professional Claims and Administrative Expenses Payee Group receive fair compensation, which they have (approximately 50% of the total recovered fees). The Receiver's proposed distribution plan goes beyond this, however, and would inequitably over-compensate this Payee Group to the detriment of the Defrauded Investors. As a result, the Court cannot approve the Receiver's proposed distribution plan; instead, the Court submits its own modified distribution plan as outlined above.

**IV.**

**CONCLUSION**

For these reasons, the Court enters the following schedule. It is **ORDERED** that: (1) the Receiver forward a copy of this Order within ten days of the date of this Order to all interested parties, including all Defrauded Investors; (2) members of the Payee Groups file any objections by May 20, 2016; and (3) the Receiver or other members of the Payee Groups file any responses by June

3, 2016. It is further **ORDERED** that a hearing on the proposed distribution plan and any objections or responses is scheduled for July 5, 2016 at 10:00 am.

Additionally, it is **ORDERED** that once a distribution plan is set in place, each law firm in the Qualified Professionals and Administrative Expenses Payee Group must submit a fee application for its requested fees within ten days. This application should include a list of any prior distributions made to the firm, a factual analysis of their fees under a *pro rata* methodology, and a legal analysis of the reasonableness of their fees. After the Court receives all fee applications, it will order an equitable *pro rata* distribution.

**SO ORDERED.**

**SIGNED: April 18, 2016**.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

- 37 -